STATE OF NEBRASKA, APPELLEE, V. CAREY DEAN MOORE, APPELLANT.

316 N.W.2d 33

Filed January 29, 1982. No. 43557.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

CLINTON, J.

The defendant, Carey Dean Moore, age 22, was charged with two counts of first degree murder as follows: (1) On August 22, 1979, having killed Reuel Eugene Van Ness, Jr., in the perpetration of or attempt to perpetrate a robbery, and (2) on August 27, 1979, having killed Maynard D. Helgeland in the perpetration of or attempt to perpetrate a robbery. After waiving a trial by jury, defendant was tried by the court and found guilty on both counts. Pursuant to the provisions of Neb. Rev. Stat. §§ 29-2520 et seq. (Reissue 1979), a sentencing hearing was held on May 22, 1980, before a panel of three judges, including the trial judge. On June 20, 1980, the defendant was, on each count, sentenced to the penalty of death by electrocution.

The case has come to this court for automatic review. The defendant assigns the following alleged errors: (1) The Nebraska statutes providing for capital punishment are unconstitutional because the death sentence is per se unconstitutional and prohibited by the eighth and fourteenth amendments to the U.S. Constitution and article I, § 9, of the Bill of Rights of the Nebraska Constitution. (2) Neb. Rev. Stat. §§ 29-2519 through 29-2523 (Reissue 1979), providing the conditions under which the death penalty may be imposed, are unconstitutional because they do not provide for a jury determination of the existence of the aggravating and mitigating circumstances described in the statutes and the appropriateness of the death penalty. (3) Sections 29-2523 et seq. are unconstitutionally vague and indefinite, and appellate interpretation has not removed this ambiguity. (4) The sentencing panel of judges did not properly apply to the evidence in the case the aggravating and mitigating circum-

stances as defined by statute and the interpretations of this court. (5) The panel erred in its review of homicide cases in which the death penalty was not imposed, claimed by the defendant to be similar to the case at bar, because the panel limited its review in accordance with our opinion in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979). (6) The death penalty statute is unconstitutional because it limits the mitigating factors which can be considered by the sentencing tribunal. (7) A conviction and sentence in a capital case cannot be sustained unless it appears beyond a reasonable doubt that no error in the factfinding of the trial contributed in any way to the determination of guilt. (8) The statutes are unconstitutional because they do not require the State to prove beyond a reasonable doubt that mitigating factors do not exist. (9) The provision of the statutes providing that the sentencing phase may be heard before either the judge who presided at the trial or before a sentencing panel of three judges, including the trial judge, is unconstitutional because it provides no guidelines for the determination of when the sentencing is to be done by a single judge and by a panel. (10) The sentence of death is excessive and should be reduced to life imprisonment.

We affirm the judgment and sentences.

The defendant did not introduce any evidence during the trial of the case. Therefore, there is no significant conflict on the issue of guilt. The defendant confessed commission of the two killings in taped interrogations by the police, which were introduced in evidence. It is not claimed that these confessions were involuntary.

An outline of the evidence, however, is necessary to a discussion of assignment (4) and in order that we may perform our independent function of determining whether the imposition of this particular death penalty is appropriate under the statutory standards, and to assure the death penalty is not imposed in an arbitrary and capricious manner.

Both of the victims were cabdrivers, and the modus

operandi in each case was similar. About August 20, 1979, the defendant purchased the handgun with which the murders were committed. He acquired the gun by purchasing it from a cabdriver who had pawned the gun. The defendant and the seller went together to the pawnshop where the gun was redeemed, the defendant furnishing the money for the redemption and paying the seller an additional $50. The gun was then test-fired.

We now quote from the findings made by the sentencing panel in its order, which findings are fully supported by uncontroverted evidence: "The defendant's own statements, in his confession to Officers O'Donnell and Thompson while in custody at Charles City, Iowa, indicate that these crimes had been in the planning stage for at least a day or two before the Van Ness homicide. Apparently on the evening prior to the Van Ness murder, the defendant had called a number of cabs from a telephone booth somewhere on Farnam Street in the downtown Omaha area to see how quickly each would respond to his call. The defendant then hid somewhere in the vicinity to await each cab's arrival, at which time he checked the cab to determine whether the driver would be a suitable victim, i.e., not too young, since the defendant stated that it was easier for him to shoot an older man rather than a younger man nearer his own age. On the evening of the Van Ness homicide, the defendant's plan was to call one cab at a time from the Smoke Pit restaurant, and, if the driver who responded 'wasn't too old,' the defendant would just not identify himself as the fare for which the cab had been summoned. When Mr. Van Ness arrived at the Smoke Pit on August 22, 1979, the defendant determined that this was the driver who would be robbed and shot because 'he wasn't too young'.

"A similar pattern of events unfolded on August 26, 1979. The defendant went to the Greyhound Bus depot at 18th and Farnam Streets in Omaha that evening,

and, when he saw a lone cab with an older driver parked at the taxi stand outside the depot, he got into the cab and directed the driver to take him to the Benson area. According to the defendant, this particular cab and driver were selected both because there were no other cabs at the taxi stand at the time, thus decreasing the chances of the defendant's being identified, and because the driver was an older man. The defendant then stated that, as previously discussed, he had planned ahead of time to rob and shoot the driver of whichever cab he selected." In his confessions the defendant stated that he killed each of the victims in order that the victim would not be able to identify him as the robber.

The body of Van Ness was found at Dam Site 16 near Omaha on the morning of August 22, 1979. The body of Helgeland was found in his cab in Omaha about 7:30 a.m. on August 27, 1979. The defendant was positively identified as one of two persons getting into the Van Ness cab at the Smoke Pit restaurant in Omaha earlier that morning. The other person was identified as his younger brother. He was positively identified by fishermen as being in the cab at Dam Site 16 before the slaying, when Van Ness asked directions in order to take the defendant to the place at the dam where he wished to go. The gun, identified by expert witnesses as the one used in the two slayings, was found in the defendant's possession in a stolen automobile when the defendant was apprehended in Iowa on August 29, 1979.

The contention of the defendant that the death penalty is in all circumstances unconstitutional as constituting cruel and unusual punishment has been rejected by the U.S. Supreme Court and this court on a number of occasions. We need not respond to that argument other than citing some of the pertinent precedents. *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976);

*State v. Rust,* 197 Neb. 528, 250 N.W.2d 867 (1977); *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977); *State v. Otey,* 205 Neb. 90, 287 N.W.2d 36 (1979); *State v. Anderson and Hochstein,* 207 Neb. 51, 296 N.W.2d 440 (1980); *State v. Harper,* 208 Neb. 568, 304 N.W.2d 663 (1981).

The defendant cites no judicial precedent or constitutional provision supporting a proposition that the U.S. and the Nebraska Constitutions require that, in order that the death penalty may be constitutionally imposed, a jury make the factual determinations pertaining to aggravating and mitigating circumstances. We have expressly rejected that contention in *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977). We there said at 559, 250 N.W.2d at 888: "As we understand the federal and the state constitutional provisions, they do not require or even suggest that jury sentencing is constitutionally required. Whatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions. The relative merits of the one or the other is for legislative and not judicial determination. We find the sentencing procedure provided by the Nebraska statute does not violate either the Nebraska or the federal Constitution." The U.S Supreme Court has, at least implicitly, rejected the contention that jury determination of the sentence is required. *Proffitt v. Florida, supra.* In that case the Court said in 428 U.S. at 252: "The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather than by the jury. This Court has pointed out that jury sentencing in a capital case can perform an important societal function, *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15 (1968), but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency

in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

The defendant's third contention, asserting that the definitions of aggravating and mitigating circumstances in the statute are so vague and indefinite as to be unconstitutional, has been addressed by this court in a series of cases which refine, clarify, and restrict that definition in response to such arguments. *State v. Simants, supra; State v. Rust, supra; State v. Stewart, supra; State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977); *State v. Otey, supra; State v. Anderson and Hochstein, supra; State v. Harper, supra*. It is clear that the general scheme of § 29-2523 meets the requirements laid down in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). See, *Gregg v. Georgia, supra; Proffitt v. Florida, supra*. We need at this time address only the specific arguments which the defendant makes in this case. The defendant's third, fourth, and fifth assignments overlap and so we will discuss them together.

It is necessary at this time to make some reference to the sentencing panel's order and the findings therein. The panel made a detailed analysis of the evidence, the provisions of § 29-2523, and the decisions of this court interpreting that statute. It considered each statutory provision separately and made factual findings based upon the evidence adduced at trial and at the sentencing hearing by both the State and the defendant. On the basis of that analysis, it made specific findings as to which aggravating and which mitigating circumstances existed in this case, including the applicability of the statutory provisions which are disjunctive.

We will later, where necessary, make reference to the details of that analysis. At this point, it will suffice to quote the panel's summary of affirmative findings.

"The sentencing panel specifically finds that, with regard to the murder of Reuel Van Ness, Jr., aggravating circumstances (b) and (d) have been found to exist beyond a reasonable doubt. By way of clarification, the panel more specifically finds that the second clause of aggravating circumstance (1)(b) (' . . . committed . . . to conceal the identity of the perpetrator') and the latter portion of aggravating circumstance (1)(d) (' . . . manifested exceptional depravity by ordinary standards of morality and intelligence'[)] are applicable in this case.

"With regard to the murder of Maynard Helgeland, the sentencing panel specifically finds that aggravating circumstances (a), (b), and (d) have been found to exist beyond a reasonable doubt. More specifically, the panel finds that the second clause of aggravating circumstance (1)(a) ('The offender . . . has a substantial history of serious assaultive or terrorizing criminal activity') is applicable to the Helgeland homicide, based on the murder four days earlier of Reuel Van Ness, Jr. In addition, the second clause of aggravating circumstance (1)(b) and the latter portion of aggravating circumstance (1)(d) are applicable to the Helgeland homicide, as they were to the Van Ness homicide."

The panel also reiterated generally its previous, more specific findings that none of the statutory mitigating factors existed, but stated that "the family background and upbringing of the defendant are entitled to consideration as a mitigating factor . . . ." It found that factor did not outweigh the aggravating circumstances.

The defendant's claim of vagueness in the statutory language and deficiency in appellate refinement of definition is directed at the language of § 29-2523(1)(d), which states: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence."

The defendant argues that under the holding of the U.S. Supreme Court in *Godfrey v. Georgia,* 446 U.S.

420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the above statutory language, even as limited by the interpretations of this court, is vague and imprecise, thus permitting a standardless imposition of the death penalty. We now turn to an examination of *Godfrey v. Georgia, supra.* Under Georgia law, if the jury finds the defendant guilty, it is instructed by the court at a separate sentencing phase of the trial on the law of aggravating and mitigating circumstances. The jury then recommends a sentence to the court. As part of that recommendation it must specifically state the supporting aggravating circumstance or circumstances which it finds exist beyond a reasonable doubt. The jury in that case found beyond a reasonable doubt " 'that the offense of murder was outrageously or wantonly vile, horrible and inhuman.' " 446 U.S. at 426. The trial court accepted the jury's recommendation, and the Supreme Court of Georgia affirmed. The U.S. Supreme Court reversed the judgment insofar as it levied a death penalty.

We now quote from or paraphrase pertinent portions of the *Godfrey* opinion: "Under Georgia law, a person convicted of murder may be sentenced to death if it is found beyond a reasonable doubt that the offense 'was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.' Ga. Code § 27-2534.1(b)(7) (1978). In *Gregg v. Georgia,* 428 U.S. 153, the Court held that this statutory aggravating circumstance (§ (b)(7)) is not unconstitutional on its face. Responding to the argument that the language of the provision is 'so broad that capital punishment could be imposed in any murder case,' the joint opinion said:

" 'It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction.'

[Citation omitted.]" 446 U.S. at 422-23.

In *Godfrey v. Georgia, supra,* the defendant was found guilty and sentenced to death for the murders of his wife and mother-in-law. Briefly, the circumstances of the crimes were that the defendant and his wife were having marital difficulties. When he threatened her with a knife, she left the family home. She commenced an action for divorce, and a court hearing was set. Before the hearing, the defendant, on several occasions, asked his wife to return. At some point during this period she moved in with her mother. The petitioner believed that the mother was actively interfering with a reconciliation. On the day before the crimes, the defendant's wife called him. She said reconciliation was impossible, and allegedly demanded all proceeds from the planned sale of their home. A similar telephone conversation took place about an hour later. The wife at that time allegedly stated that her mother supported her position. The wife then hung up the telephone. Defendant obtained a shotgun and walked to his mother-in-law's trailer home. He saw his wife, mother-in-law, and young daughter playing cards. He fired through a window, killing his wife. He entered the trailer and struck his 11-year-old daughter with the gun barrel and then shot his mother-in-law. Both of the women died instantly from gunshot wounds to the head.

"The issue now before us is whether, in affirming the imposition of the sentences of death in the present case, the Georgia Supreme Court has adopted such a broad and vague construction of the § (b)(7) aggravating circumstance as to violate the Eighth and Fourteenth Amendments to the United States Constitution." 446 U.S. at 423. "In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' There is nothing in these few words, standing alone, that implies any inherent restraint

on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.' Such a view may, in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation.

"The standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury in this case was in no way cured by the affirmance of those sentences by the Georgia Supreme Court. Under state law that court may not affirm a judgment of death until it has independently assessed the evidence of record and determined that such evidence supports the trial judge's or jury's finding of an aggravating circumstance. Ga. Code § 27-2537(c)(2) (1978)." 446 U.S. at 428-29.

The U.S. Supreme Court then went on to discuss previous opinions of the Georgia Supreme Court interpreting Ga. Code Ann. § 27-2534.1(b)(7) (Rev. 1978) and noted that in those cases the Georgia court had appropriately defined and limited the applications of the § 27-2534.1(b)(7) language. It held that in the *Godfrey* case, the Supreme Court of Georgia had not followed the criteria previously established, and concluded: "Nothing said on appeal by the Georgia Supreme Court indicates that it took a different view of the evidence. The circumstances of this case, therefore, do not satisfy the criteria laid out by the Georgia Supreme Court itself in the *Harris* and *Blake* cases. In holding that the evidence supported the jury's § (b)(7) finding, the State Supreme Court simply asserted that the verdict was 'factually substantiated.'" 446 U.S. at 432. The Court further stated: "The petitioner's crimes cannot be said to

have reflected a consciousness materially more 'depraved' than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma." 446 U.S. at 433.

The Court, in n. 15, stated at 432-33: "The sentences of death in this case rested exclusively on § (b)(7). Accordingly, we intimate no view as to whether or not the petitioner might constitutionally have received the same sentences on some other basis. Georgia does not, as do some States, make multiple murders an aggravating circumstance, as such."

In short, the U.S. Supreme Court's vacation of the death sentence in *Godfrey* rested upon: (1) Lack of precise instructions to the jury and impreciseness of the jury's findings. (2) Failure of the Supreme Court of Georgia to follow its own previously established criteria interpreting § 27-2534.1(b)(7). (3) The court's apparent failure to independently review the factual findings of the trial court and jury. (4) As the U.S. Supreme Court noted, the victim was causing the actor "extreme emotional trauma," and the crime was motivated by overwhelming passion. (It should be noted the factual circumstances in *Godfrey* are quite different from the one before us.) (5) The jury was not instructed on the restricted definition of § 27-2534.1 (b)(7), which had been adopted by the Georgia Supreme Court.

The holding of the U.S. Supreme Court in *Godfrey* clearly does not control in the case before us for a number of reasons. First, the sentencing panel in the case at bar made very specific findings by way of meticulous analysis of the evidence and careful application of the statute as well as this court's prior interpretations thereof. The panel is not an uninstructed jury. Second, the imposition of the death penalty in the case before us did not rest wholly upon a finding of the existence of aggravating circumstance (1)(d) of § 29-2523, which we will discuss in

more detail later since it is the heart of the defendant's argument. Instead, the sentence in this case is supported by the existence of several aggravating circumstances completely supported by uncontroverted evidence. Third, the factual circumstances of the murders in our present case are quite different from those in *Godfrey*, as we have discussed earlier. Fourth, this court does, as we hereafter set forth, review and independently confirm the panel's findings. None of the factors leading to reversal in *Godfrey* exist in this case.

We now turn to the defendant's claim of vagueness. The U.S. Supreme Court in *Godfrey* did not overrule its previous holding in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). The language of the Georgia statute, § 27-2534.1(b)(7), was not unconstitutional on its face. Aggravating circumstance (1)(d) of § 29-2523 literally, and as interpreted by this court, describes in the disjunctive two separate circumstances which may operate in conjunction with or independent of one another. The first circumstance is that the murder was especially heinous, atrocious, or cruel. We have said that this circumstance is directed to the "pitiless crime which is unnecessarily torturous to the victim" and to cases where torture, sadism, or the imposition of extreme suffering exists. *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977); *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867 (1977). In this case the sentencing panel found that aggravating circumstance did not exist. We agree. The second circumstance pertains to the state of mind of the actor. In *State v. Stewart, supra,* we said the second instance indicates a situation "where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence" (syllabus of the court), and in *State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876 (1977), it indicates a state of mind "totally and senselessly bereft of any regard for human life" (syllabus of the court). The sentencing

panel found the second circumstance did apply. We agree that the following circumstances exhibit a state of mind exceptionally depraved and totally and senselessly bereft of regard for human life: (1) The murders here were coldly planned as a part of the robberies. (2) The evidence clearly supports the conclusion that the murders were to be repetitive, i.e., the defendant intended to continue on his selected course of conduct so long as his needs required. (3). The victims were selected on the basis of certain characteristics which made it easier for the defendant to shoot them, namely, their ages. His unstated conclusion was that a human life in the middle years is less valuable than a younger life.

The sentence in this case does not rest wholly upon the findings with reference to circumstance (1)(d) of § 29-2523. As the sentencing panel found, and as we independently find, additional independent aggravating circumstances exist. In both the Van Ness and the Helgeland murders, the crimes were committed to conceal the identity of the perpetrator. § 29-2523(1)(b). This, Moore acknowledged, was one of his motives for the killings. In the Helgeland murder there existed yet a third aggravating circumstance, a substantial history of violence, as demonstrated by the Van Ness murder a few days earlier. § 29-2523(1)(a). The sentencing panel carefully analyzed this element in accordance with our prior interpretations. *State v. Rust, supra; State v. Holtan, supra.* In *Holtan* we said at 546, 250 N.W.2d at 879: "'History' refers to the individual's past acts preceding the incident for which he is on trial and 'substantial,' . . . refers to an actual, material, and important history of acts of terror of a criminal nature. It does not refer to the particular incident involving the homicide for which he is subject to sentence." See *State v. Perry*, 199 Neb. 656, 261 N.W.2d 95 (1977).

The defendant argues that in imposing the sentence of death, the panel did not apply the provisions of 1978

Neb. Laws, L.B. 711, §§ 29-2519 to 29-2521.04. This argument is founded in part upon the premise that in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979),. this court did not properly interpret L.B. 711.

The act in question provides in part: "(5) In order to compensate for the lack of uniformity in charges which are filed as a result of similar circumstances it is necessary for the Supreme Court to review and analyze all criminal homicides committed under the existing law in order to insure that each case produces a result similar to that arrived at in other cases with the same or similar circumstances." § 29-2521.01.

"The Supreme Court shall within a reasonable time after July 22, 1978, review and analyze all cases involving criminal homicide committed on or after April 20, 1973. Such review and analysis shall examine (1) the facts including mitigating and aggravating circumstances, (2) the charges filed, (3) the crime for which defendant was convicted, and (4) the sentence imposed. Such review shall be updated as new criminal homicide cases occur." § 29-2521.02.

"The Supreme Court shall, upon appeal, determine the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases involving the same or similar circumstances. No sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances. The Supreme Court may reduce any sentence which it finds not to be consistent with sections 29-2521.01 to 29-2521.04, 29-2522, and 29-2524." § 29-2521.03.

"Each district court shall provide all records required by the Supreme Court in order to conduct its review and analysis pursuant to sections 29-2521.01 to 29-2521.04, 29-2522, and 29-2524." § 29-2521.04.

In *State v. Williams, supra*, we held that L.B. 711 required this court to review only cases in which the defendant was found guilty of first degree murder, and in *State v. Welsh*, 202 Neb. 249, 275 N.W.2d 54 (1979),.

we held that the procedure is applicable in this court only when the death penalty is imposed. The defendant now argues that our reviews have been inadequate, and, in his brief, states: "The concern of the Nebraska Legislature was directed, in part, in insuring that there is uniformity throughout the State in death sentencing. Section 29-2521.01, R.S. Supp. 1978. Obviously, to consider only first-degree murder convictions is to exclude from determination a large group of homicides in which defendants avoided death by being charged with lesser crimes than first-degree murder or by pleading to lesser charges, or by other acts of prosecutorial discretion in interpreting the charging facts. It is a hollow review indeed if these cases are excluded from review. It becomes a cruel facade if a defendant's case is reviewed only against other capital cases and not against lesser homicides which might involve the same or similar circumstances."

In *State v. Williams, supra* at 76, 287 N.W.2d at 29, we said: "To interpret that language of L.B. 711 literally would create insurmountable constitutional problems. In view of the disposition made here, it is unnecessary to discuss constitutional issues." We did not there elaborate on the constitutional problems except to indicate that they relate to the constitutional division of powers between the branches of government, specifically mentioning prosecutorial discretion. The prosecutor is obviously a member of the executive branch of government. We now find it necessary to delineate the reasons why a literal application of L.B. 711 would unconstitutionally encroach upon the judicial function. In so doing, we will define more precisely the limits within which L.B. 711 may constitutionally be applied.

We first state the underlying legal principles and then illustrate their application. Neb. Const. art. II, § 1, provides: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or

collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted." A similar division of powers, under the U.S. Constitution, is held to exist by implication. Corwin's The Constitution and What It Means Today at 6-7, 204 (14th ed. H. Chase & C. Ducat 1978); *Hampton & Co. v. United States*, 276 U.S. 394, 48 S. Ct. 348, 72 L. Ed. 624 (1928); *Hayburn's Case*, 2 Dall. 409, 2 U.S. 409, 1 L. Ed. 436 (1792).

The separation of powers doctrine imposes restrictions upon the legislative branch to limit the judicial functions of the courts. The Legislature cannot, by subsequent legislation, divest rights which have vested by virtue of a judgment. *City of Wayne v. Adams*, 156 Neb. 297, 56 N.W.2d 117 (1952). It cannot enact legislation to retroactively open or vacate a judgment. *Mooney v. Drainage District, on rehearing* 134 Neb. 192, 278 N.W. 368 (1938), *cert. denied* 305 U.S. 622, 59 S. Ct. 84, 83 L. Ed. 398 (1938). The limits of the jurisdiction conferred upon the Supreme Court by the Constitution may not be increased or extended by legislative enactment. *State ex rel. Wright v. Barney*, 133 Neb. 676, 276 N.W. 676 (1937); *Miller v. Wheeler*, 33 Neb. 765, 51 N.W. 137 (1892); *State v. Hall*, 47 Neb. 579, 66 N.W. 642 (1896). It cannot change procedures established by the Constitution. *State ex rel. v. Ellis*, 156 Or. 83, 66 P.2d 995 (1937). It cannot interfere with the judicial function of adjudicating the fact of an acquittal. *In re Johnston*, 3 Cal. 2d 32, 43 P.2d 541 (1935). It may not reverse a judgment. *Roberts v. The State*, 160 N.Y. 217, 54 N.E. 678 (1899). It may not direct the disposition of a case in which jurisdiction has attached. *State v. Costen*, 141 Tenn. 539, 213 S.W. 910 (1919). It is to be clearly implied from the foregoing principles that the Legislature cannot direct the disposition of one case by the factual determinations in another.

It is apparent from the language of § 29-2521.01(5)

and § 29-2521.02 that the Legislature attempts to impose a mandate upon this court to look behind prosecutorial judgments concerning the charges to be filed, jury verdicts determining the particular degree of homicide, and then, based upon our independent findings of the facts in those adjudicated cases, to determine the penalty in the case before us.

We must examine the constitutional import of the foregoing legislative purpose. In examining prosecutorial discretion we would of necessity have to independently gather evidence. The gathering of evidence is not a judicial function but one of the executive. We would then determine what charges we think should have been filed. Again, this is an executive function of the prosecutor. We would make a judgment about the chances of a conviction as against an acquittal, again an executive function. We would need to weigh the advisability of a plea bargain to secure a conviction on a lesser charge in order to avoid a likely acquittal of all charges. These are all clearly executive and not judicial functions.

It must be borne in mind that not all homicide convictions result in appeals to this court. The following illustrates the Legislature's intrusion into the judicial function under L.B. 711. If a person is charged with murder in the first degree but convicted of a lesser degree of homicide, and if L.B. 711 is to be applied literally, we would then, for purposes of reviewing the case before us, disregard the factfindings of the jury in the so-called "analogous" case. Such a procedure would be constitutionally objectionable for a number of reasons. First, it would require this court to find facts in a case not before it. Secondly, it would constitute an attempt by the Legislature to make the factfindings of one case determinative of the sentence in another case on review. It is plain that under the principles we have earlier cited, that legislation which attempts to achieve such results is an intrusion on the judicial function, contrary to the separation of powers doc-

trine, and thus violates article II, § 1.

Another effect of L.B. 711 would be to unconstitutionally restrict the appellate review powers of this court under Neb. Const. art. I, § 23, as that legislation attempts to bind this court by requiring it to apply sentences imposed in some "analogous" case in a district court. It is clear that applying such a standard would restrict a defendant's right to an independent review by this court under article I, § 23, of the Bill of Rights of our Nebraska Constitution. This section provides: "In all cases of felony the defendant shall have the right of appeal to the Supreme Court; and in capital cases such appeal shall operate as a supersedeas to stay the execution of the sentence of death, until further order of the Supreme Court."

Upon this closer review of L.B. 711, it is clear the Legislature in that act attempts to exercise the judicial function in violation of the Constitution. Sections 2 and 3 of L.B. 711 must be restricted in their application to a comparison in this court of only those cases in which the defendant in the District Court has been convicted of murder in the first degree.

L.B. 711 thus construed is coextensive with our duty under the federal Constitution, under our own state Constitution, and under the statutory provisions for automatic review to determine in the death penalty cases which come before us whether the provisions of § 29-2523 are properly applied, and to assure the death penalty is not arbitrarily and capriciously imposed. *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980); *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977). We will, of course, continue to make comparisons. Each District Court will continue to furnish to this court, in accordance with our previous administrative order, the records of all convictions of first degree murder not appealed to this court. § 29-2521.04. If either the State or the defendant

wishes to call to the attention of the sentencing judge or sentencing panel, for the purposes of comparison, the facts and sentence in any case of first degree homicide which has not been appealed to this court, it should be done at the sentencing hearing by means of admissible evidence for which proper foundation is laid. This, of course, will mean, in most cases where the fact is not admitted or is challenged, producing the official records or pertinent portions thereof of the case which is to be called to our attention.

At the sentencing hearing in this case the defendant introduced an exhibit related to the case of *State v. Cecil Henry Floyd* in the District Court for Hamilton County, Nebraska. This is one of the unappealed cases reviewed by this court in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979). Although not specifically argued, it clearly appears the apparent purpose of introducing the exhibit was to raise the issue of whether an isolated case in which the death penalty perhaps should have been imposed, but was not, becomes the standard which governs all capital cases before this court.

In the exhibit just referred to above is a two-page typewritten summary, obviously prepared by counsel, which among other things contains the following statement: "Source of Information," followed by the name of the prosecutor and defense counsel in that case. The summary otherwise purports to show that Floyd, previous to the Nebraska homicide (felony murder in the course of a robbery), was serving a term of life imprisonment for homicide in Indiana and had pled guilty to three homicides in Florida. We have again reviewed the official transcript of the *Floyd* case. Proof was made in that case of the Indiana conviction only and none of the circumstances of the Indiana case are shown by the record. The only pertinent other evidence adduced at the sentencing hearing was the testimony of the victim's mother, in which she requested the death penalty not be imposed,

and the testimony of the defendant Floyd, in which he stated he had not intended to kill the victim but that the gun discharged in the course of a struggle when the victim attempted to take the weapon away from him. The defendant also recited a history of mental illness.

In the *Floyd* case the sentencing judge, in ruling upon an objection to the presentence investigation report, stated he would take into consideration only those matters therein which were properly before him, i.e., insofar as other murder convictions were concerned, those that were proved by proper evidence and not the hearsay testimony of defense counsel and prosecutor. The sentencing judge did not make detailed findings as to aggravating and mitigating circumstances. He apparently regarded the imposition of the penalty as being within his "discretion." He imposed a sentence of life imprisonment, to be served consecutive to the Indiana life sentence and consecutive to any other sentence the defendant might serve elsewhere, allowing no credit on the Nebraska life sentence for any time served elsewhere. The court directed that the defendant be returned to Indiana and that "holds" be placed by the Indiana sheriff as well as any other states' sheriffs in which the defendant was wanted. It may be that the death sentence should have been imposed in the *Floyd* case had proper proof been made, but such a determination is impossible from the limited record before us. The record showed no competent proof of the alleged Florida homicides or of the circumstances surrounding them. Nor was there any proof of the circumstances surrounding the Indiana case. If the State wishes to prove as an aggravating circumstance a conviction of the defendant in other states, it must do so by authenticated copies of such conviction unless, of course, the fact is admitted.

Our reading of *Godfrey* does not lead us to an understanding that an isolated, unappealed trial court judgment is to be the standard by which all other sentences must be judged. The U.S. Supreme Court's purpose

in that case was to mandate the death penalty not be inflicted arbitrarily and capriciously. The Court imposed upon the states the duty of defining the circumstances under which the death penalty should be imposed in such a way as to obviate "standardless" sentences. Section 29-2523, as interpreted and limited by this court, does afford "specific and detailed guidance" in the imposition of sentence and makes "rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).

The defendant argues that the sentencing panel erred in finding that a mitigating factor, to wit, "(2)(a) The offender has no significant history of prior criminal activity," did not exist. The record disclosed that the defendant had one previous felony conviction, auto theft, for which he served a term of 1 to 2 years in the Nebraska Penal and Correctional Complex, and that he admitted having forged approximately $1,100 in checks prior to the crimes involved here. The panel also mentioned that he had a juvenile record of lesser offenses. The defendant argues that "consideration" of the latter was error. We hold that this particular juvenile record should be disregarded. What, if any, offenses in a juvenile record should be considered and under what category of aggravating or mitigating factors will obviously depend upon the nature of the act. Nonetheless, the commission of two felonies cannot support a finding that there is no significant prior criminal history. In any event, this mitigating factor, even if it were said to exist, does not, even when considered with family history, outweigh the aggravating factors.

The records and the convictions since *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), which we have reviewed disclose that the standards of § 29-2523 are being carefully applied by the sentencing judge or panel.

The defendant asserts that § 29-2523 is unconstitu-

tional, because it limits the mitigating factors which may be considered in determining sentence. There is no basis for this contention. Section 29-2521 provides in part: "[E]vidence may be presented as to any matter that the court deems relative to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances set forth in section 29-2523. Any such evidence which the court deems to have probative value may be received." In *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977), we specifically held that the consideration of mitigating factors or circumstances was not limited by the statute. Evidence in mitigation need only be relevant and probative. The defendant cannot complain of a provision so obviously open ended in the accused's favor.

The defendant's seventh assignment is as follows: "A conviction and sentence in a capital case cannot be sustained unless it appears, beyond a reasonable doubt, that no error in the fact-finding of trial contributed in any way to the jury's determination of guilt." The defendant's argument on this point is so convoluted as to literally make no sense. The defendant has made no claim of error in the factfinding process leading to the determination of guilt. We have examined the record and found none. The defendant was guilty beyond any doubt at all.

The defendant's eighth assignment asserts that the State has the burden of proving beyond a reasonable doubt that no mitigating factor exists. He cites no authority for this proposition. None seems to exist. There is no evidence or claim that the State suppressed any favorable evidence. If there were any mitigating factors other than those shown, the defendant is in the best position to know and reveal those factors.

The death sentence in this case is affirmed.

AFFIRMED

KRIVOSHA, C.J., and WHITE, J., concur in that portion of the opinion affirming the conviction, and

dissent from that portion of the opinion affirming the imposition of the death penalty. We would have sentenced the appellant to be confined for the balance of his natural life.