REQUESTED BY: Senator Ed Schrock Nebraska State Legislature
In your opinion request letter, you state that:
LB 555 was introduced to require any public power district which is responsible for decommissioning a nuclear power plant to collect sufficient funds from its customers during a period not exceeding the original operating license for the plant, to pay all estimated costs associated with decommissioning that plant. The amount collected from each customer subject to this legislation would fairly and equitably apportion the decommissioning costs among those who have rights to receive the output of the plant during the period of collection.
The Legislature's Natural Resources Committee held a public hearing on LB 555 in February, and several issues were raised regarding the constitutionality of the bill at that hearing. Accordingly, you have requested our analysis of the bill and constitutional issues involving "special legislation, separation of powers doctrine, vested rights doctrine, impairment of obligation of contracts, and the taking clause." Our response to your opinion request is set out below.
 BACKGROUND LB 555 would add the following language to Neb. Rev. Stat. § 70-627.02 (1996):
 In order to protect the public health and safety, the environment, and the well-being of Nebraska's electrical energy consumers, a public power district which is responsible for decommissioning a nuclear power facility shall, during a period as determined by such district but not exceeding the period of the original operating license for the facility, collect from customers of the facility sufficient funds to pay all estimated costs associated with decommissioning such facility. Funds shall be collected from consumers of the facility in amounts that fairly and equitably apportion such costs among those having rights to receive the output of the facility during the period of collection.
While the provisions of LB 555 speak in general terms, it appears from the committee hearing transcript that, as is often the case, the bill is designed to remedy a specific situation which is not apparent on the face of the legislation. That situation has implications for the constitutional issues you have raised, so we will set out our understanding of the circumstances underlying the bill, based upon testimony at the committee hearing and the decision in Nebraska PublicPower District v. MidAmerican Energy Company, 234 F.3d 1032 (2000).
Nebraska has two nuclear power plants. One, located at Fort Calhoun, Nebraska, is operated by the Omaha Public Power District. The other, located at Brownville, Nebraska, is the Cooper Nuclear Station ("Cooper"), which is owned and operated by the Nebraska Public Power District ("NPPD"). Cooper was built by the predecessor of NPPD in the late 1960's. At the time Cooper was built, the predecessor of NPPD entered into a long-term Power Sales Contract ("Sales Contract") with the predecessor of MidAmerican Energy Company ("MEC"), a privately-owned Iowa corporation. The predecessor of NPPD also entered into a similar long-term Power Sales Contract with the Lincoln Electric System ("LES"). Under those contracts, MEC purchases 50% of the net power and energy from Cooper, and LES purchases 12.5% of that power. The remaining power generated by the plant is used or sold by NPPD.
The Sales Contract between MEC and NPPD remains in effect until 2004. That contract requires NPPD to inform MEC by 2003 whether it will decommission Cooper or continue operating the facility after 2004. If NPPD elects to decommission the Cooper plant, MEC and NPPD must share decommissioning costs. However, if NPPD continues operating Cooper after 2004, the Sales Contract terminates MEC's continuing obligations arising from Cooper and its right to "any refund of excess payments for power and energy theretofore purchased."
It has become apparent over the years since Cooper was built that the costs of decommissioning the facility will greatly exceed those originally anticipated, and may total as much as $600,000,000. In 1988, the federal Nuclear Regulatory Commission adopted a rule requiring operators of nuclear facilities to file decommissioning plans and to pre-fund decommissioning by placing money in an external sinking fund. Since 1984, MEC and NPPD have set aside money for decommissioning the Cooper plant. However, those parties have no written agreement regarding decommisioning costs apart from the original Sales Contract, and NPPD simply added a separate line item to its monthly energy bill to MEC for decommissioning costs. MEC paid those separate decommissioning charges as they were billed.
NPPD and MEC are now disputing whether the Sales Contract requires MEC to make current, non-refundable payments towards estimated decommissioning costs associated with the shut down of the Cooper plant even if NPPD continues to operate Cooper after 2004, and whether MEC may recover the monies it has already paid for such decommissioning costs. NPPD filed a declaratory judgment action in the United States District Court for the District of Nebraska in connection with that dispute to determine the obligations of the parties under the Sales Contract. The federal district court ruled in favor of NPPD with regard to summary judgment motions in that lawsuit. However, the Eighth Circuit Court of Appeals reversed the lower court, and held as follows:
We hold, therefore, that considering all proper evidence, the PSC [Sales Contract] does not require MEC to make current, non-refundable payments of estimated decommissioning costs to NPPD, but makes MEC liable for Cooper's decommissioning only in the event the NPPD shuts Cooper down in 2004. Moreover, the PSC does not bar MEC's claims for restitution of amounts already paid.
Nebraska Public Power District v. MidAmerican Energy Company,234 F.3d 1032, 1046 (2000). LB 555 apparently represents an effort to deal with the results of that litigation through legislation.
 ANALYSIS
In your opinion request letter, you raise constitutional concerns with LB 555 in five different areas. We will consider each of those areas in turn.
 1. Special Legislation Art. III, § 18 of the Nebraska Constitution provides, as is pertinent:
 The Legislature shall not pass local or special laws in any of the following cases, that is to say:
* * * *
 Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted.
A legislative act violates art. III, § 18 if the act (1) creates a totally arbitrary and unreasonable method of classification, or (2) creates a permanently closed class. Bergan Mercy Health System v. Haven,260 Neb. 846, 620 N.W.2d 339 (2000); Mapco v. State Board ofEqualization, 238 Neb. 565, 471 N.W.2d 734 (1991); Haman v. Marsh,237 Neb. 699, 467 N.W.2d 836 (1991). LB 555 must be tested under that standard.
A. Nature of the Classification.
The first step in any analysis under the special legislation standard set out above involves a determination of precisely what classifications are established by the statutory language under consideration. See Bergan Mercy Health System v. Haven, 260 Neb. 846,620 N.W.2d 339 (2000). In that regard, it appears to us that LB 555, on its face, creates at least two classifications which must be tested under art. III, § 18.
First of all, customers of nuclear power generating facilities would be treated differently under LB 555 than customers of other types of power generating facilities. Under that bill, customers of nuclear power generating facilities would be required, by statute, to pay a portion of the decommissioning costs for the nuclear facilities over time. Such costs would not be statutorily imposed on customers of other types of power generating facilities when those facilities are decommissioned.
Second, LB 555 creates a classification for those public power districts in Nebraska which must decommission nuclear power plants as distinguished from those public power districts which might decommission other forms of power generating facilities. Under LB 555, public power districts which decommission nuclear power facilities would have a statutory right and duty to recover decommissioning costs from their customers. Public power districts which decommission other forms of energy generating facilities would not have that statutory right and duty to recover costs.
B. Arbitrariness and Unreasonableness of the Classification.
The first part of the special legislation test established in Nebraska cases involves a determination as to whether a statutory classification is totally arbitrary and unreasonable. In that context, the classification must bear a reasonable and substantial relation to the legitimate objects and purposes of the legislation. Pick v. Nelson,247 Neb. 487, 528 N.W.2d 309 (1995). As stated in the Haman case:
 A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference . . . . Classification is proper if the special class has some reasonable distinction from other subjects of like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes of the legislation. The question is always whether the things or persons classified by the act form by themselves a proper and legitimate class with reference to the purpose of the act.
Haman v. Marsh, 237 Neb. 699, 711, 467 N.W.2d 836, 846 (1991) (quotingState ex rel. Douglas v. Marsh, 207 Neb. 598, 300 N.W.2d 181
(1980)) (emphasis in original).
We cannot say that there clearly is no substantial difference between the public power districts and energy customers which would be affected by operation of LB 555 and other public power districts and energy customers, or that diverse legislation regarding those classifications is not expedient. For one thing, we gather that decommissioning a nuclear power facility is considerably more costly and complicated than decommissioning other forms of energy generating facilities, and that difference might well justify different legislative treatment for the costs of such a decommissioning effort. For that reason, we do not believe that LB 555 clearly violates the first part of the special legislation test set out in Nebraska authorities. However, with respect to the first portion of the special legislation test, it would be useful if the legislative history of LB 555 were to contain some description of the substantial differences in situation or circumstances which led to the diverse treatment and classifications set out in the legislation.
C. Permanently closed class.
A legislative classification may also violate art. III, § 18 as improper special legislation if it creates a permanently closed class. In considering whether a class established by legislation is closed, the courts are not limited to the face of the legislation, but may consider the act's application. Haman v. Marsh, 237 Neb. 699, 467 N.W.2d 836
(1991). In such a consideration, courts must consider the actual probability that others will come under the act's operation. Id. If the prospect that others may come under the act's operation is merely theoretical, and not probable, the act is special legislation. Id. The conditions of entry into the class must not only be possible, but reasonably probable of attainment. Id.
We do not believe that either of the classifications established by LB 555 described above clearly creates a permanently closed class. We gather than there are a number of power districts and other energy users which might want to purchase electrical power from one of the nuclear power facilities in the state so that additions to the class of customers of nuclear power plants which would pay part of decommissioning costs are more than a theoretical possibility and reasonably probable of attainment. In addition, while it is somewhat more problematic, it appears to us that there is at least some reasonable probability that additional public power districts will be required to decommission nuclear power facilities in the future. For example, additional nuclear power facilities might be built in Nebraska, given the current concerns nationwide about the availability of energy. Consequently, we do not believe that LB 555 creates permanently closed classes under the applicable standards, and the bill does not constitute special legislation.
 2. Separation of Powers and Vested Rights Doctrine
We will discuss your next two areas of constitutional concern together because the law pertaining to those constitutional provisions appears to be closely related.
Art. II, § 1 of the Nebraska Constitution provides that:
 The powers of the government of this state are divided into three distinct departments, the Legislative, Executive and Judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted.
This constitutional provision prohibits one department of government from encroaching on the duties and prerogatives of the others or from improperly delegating its own duties and prerogatives to another, except as the Nebraska Constitution itself otherwise directs or permits. Statev. Phillips, 246 Neb. 610, 521 N.W.2d 913 (1994).
At the outset, it appears to us that there is nothing on the face of LB 555 which constitutes an improper encroachment by one department of government upon the duties of another or an improper delegation of duties from one department of government to another. The bill simply provides that decommissioning costs for nuclear power plants will be assessed against the customers of those plants on the basis of their use of power. Therefore, the bill is distinguishable from legislation in other cases where there was direct action by the legislative department against the duties and prerogatives of another department of government. See,e.g., Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995) (legislation passed by Congress which specifically reinstated causes of action under the Securities and Exchange Act which had previously been dismissed by the federal courts as time-barred under the applicable statute of limitations violated separation of powers); State v. Phillips,246 Neb. 610, 521 N.W.2d 913 (1994) (resentencing statute violated separation of powers clause by purporting to grant commutation power to the judiciary rather than the Board of Pardons). There is also nothing on the face of LB 555 which directly affects vested rights of specific private parties.
While LB 555 does not appear to violate the principles involving separation of powers or vested rights on its face, we believe that it would run afoul of both separation of powers and the due process clause should it be applied in such a way as to attempt to alter the status of the situation involving MEC and NPPD described above.
Nebraska cases make it clear that statutes may not operate retroactively so as to impair vested rights. Karrer v. Karrer,190 Neb. 610, 211 N.W.2d 116 (1973); Travelers' Insurance Co. v. Ohler,119 Neb. 121, 227 N.W. 449 (1929). Similarly, private rights of parties which have vested by the judgment of a court cannot be taken away by subsequent legislation. State v. Moore, 210 Neb. 457, 316 N.W.2d 33
(1982);Karrer v. Karrer, 190 Neb. 610, 211 N.W.2d 116 (1973); Mooney v.Drainage District No. 1 of Richardson County, 134 Neb. 192, 278 N.W. 368
(1938). The latter rule is based upon both separation of powers and due process principles. See State v. Moore, 210 Neb. 457, 316 N.W.2d 33
(1982);Karrer v. Karrer, 190 Neb. 610, 211 N.W.2d 116 (1973).
As we understand it, MEC has vested rights under its contract with NPPD to pay for the decommissioning costs of the Cooper nuclear facility only in certain circumstances.[1] In addition, the judgment by the Eight Circuit Court of Appeals in Nebraska Public Power District v.MidAmerican Energy Company, 234 F.3d 1032 (2000) affirming MEC's limited obligations under the Sales Contract is final.[2] As a result, we believe that the provisions of LB 555 may not be applied in such a way as to require MEC to pay for the decommissioning costs of the Cooper Nuclear facility in any fashion apart from its obligations under the Sales Contract. To do so, would violate separation of powers and due process of law.
 3. Impairment of the Obligation of Contracts
Article I, Section 10 of the United States Constitution provides that "[n]o State . . . shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." Similarly, art. I, § 16 of the Nebraska Constitution provides that "[n]o . . . law impairing the obligation of contracts . . . shall be passed." Those constitutional provisions form the basis for your next constitutional concern involving LB 555.
Although the language of the Contract Clause appears absolute, its prohibition must be accommodated to the inherent police power of the states. Energy Reserves Group v. Kansas Power and Light Company,459 U.S. 400 (1983). As a result, the federal courts and the Nebraska Supreme Court have formulated tests for determining when a particular statute violates the Contract Clause. The language of those formulations is somewhat different, but taken together, they establish the following factors in a Contract Clause analysis:
 1. It must determined whether the state statute constitutes an impairment of a contract. Miller v. City of Omaha, 253 Neb. 798, 573 N.W.2d 121
(1998); Calabro v. City of Omaha, 247 Neb. 955, 531 N.W.2d 541 (1995). In that context, "impairment" means "to make worse," and the impact of the statute on the contract must take away something and not work to a party's benefit. Miller v. City of Omaha, 253 Neb. 798, 573 N.W.2d 121
(1998).
 2. The impairment of the contractual relationship must be substantial. Energy Reserves Group v. Kansas Power and Light Company, 459 U.S. 400
(1983); Miller v. City of Omaha, 253 Neb. 798, 573 N.W.2d 121 (1998); Calabro v. City of Omaha, 247 Neb. 955, 531 N.W.2d 541 (1995). The severity of the impairment increases the level of scrutiny to which the legislation is subjected. Energy Reserves Group v. Kansas Power and Light Company, 459 U.S. 400 (1983). Total destruction of contractual expectations is not required for a finding of substantial impairment, however. Id. In addition, in determining the extent of impairment, courts will consider whether the industry the complaining party has entered has been regulated in the past. Id.
 3. If the state statute constitutes a substantial impairment of contractual obligations, the State, in justification, must have a significant and legitimate public purpose behind the regulation such as remedying a broad or general social or economic problem. Energy Reserves Group v. Kansas Power and Light Company, 459 U.S. 400 (1983). The legitimate public purpose requirement guarantees that the State is exercising its police power rather than providing a benefit to special interests. Id.
 4. Once a legitimate public purpose has been identified, then the final inquiry is whether the statutory adjustment of the obligations is based upon reasonable conditions and of a character appropriate to the public purpose justifying the statute's adoption. Energy Reserves Group v. Kansas Power and Light Company, 459 U.S. 400 (1983). In that regard, unless the State itself is a party, it is customary for courts to defer to legislative judgment as to the necessity and reasonableness of a particular statute. Id.[3]
On its face, LB 555 does not impair the obligation of any particular contract by its specific language. However, once again, to the extent that the bill might be applied to alter the effect of the Sales Contract between MEC and NPPD, it must be analyzed under the Contract Clause using the formulation set out above.
Initially, we believe that LB 555 would impair the obligations of the Sales Contract between MEC and NPPD. Under the Sales Contract as construed by the Eighth Circuit, MEC has no obligation to make current, non-refundable payments of estimated decommissioning costs to NPPD, and is only liable for Cooper's decommissioning in the event the NPPD shuts Cooper down in 2004. Moreover, the Sales Contract does not bar MEC's claims for restitution of amounts already paid. If LB 555 is implemented with respect to MEC and NPPD, then MEC will be required to make payments to NPPD for decommissioning the Cooper plant, regardless of whether or not the plant continues to operate after 2004. Therefore, if LB 555 is applied to the situation involving MEC and NPPD, it appears that MEC's position is made worse, and it loses something in a manner which is not to its benefit.
It is less clear whether the impact of LB 555 on the MEC/NPPD Sales Contract would be "substantial." On one hand, the amounts of money at issue for MEC are huge, and it could be argued that LB 555 totally destroys some of MEC's contractual expectations under the Sales Contract. On the other hand, the nuclear power industry is and has been heavily regulated by federal authorities, and more stringent regulations were enacted during the course of the contract's implementation. As a result, it could be argued that MEC should have contemplated that its obligations under the contract could be changed by regulation over the course of time.
It is also not clear whether there is a significant and legitimate public purpose underlying LB 555 such as remedying a broad or general social or economic problem. The bill contains language which recites a public purpose, and during the public hearing on the bill, proponents offered justifications for the bill which were primarily related to sharing the costs of nuclear power and treating ratepayers equitably. However, the bill has a very narrow focus which, as discussed in the special legislation section above, would make it possible to argue that the bill is a benefit to special interests rather than a general exercise of the state's police power. See Energy Reserves Group v. Kansas Powerand Light Company, 459 U.S. 400, 412 n. 13 (1983).
Finally, the impact of the bill's adjustment to MEC's contract rights under the Sales Contract must be based upon reasonable conditions and of a character appropriate to the public purpose justifying the bill's adoption. However, since the Sales Contract does not involve the State itself as a party, we would assume that courts would defer to the Legislature's judgment as to the necessity for and reasonableness of the legislation.
When all of these various factors are considered, we believe that, on balance, courts would likely consider LB 555 to be an unconstitutional impairment of MEC's contract rights should the provisions of the bill be applied to the situation involving MEC and NPPD. Our conclusion in that regard is influenced, in part, by the other constitutional infirmities in the bill as discussed elsewhere in this opinion.
 4. Unconstitutional Taking
The Fifth Amendment to the United States Constitution provides, as is relevant: "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Art. I, § 21 of the Nebraska Constitution also provides: "[t]he property of no person shall be taken or damaged for public use without just compensation therefor." Those constitutional provisions are at issue with respect to your final constitutional concern regarding LB 555.
As has previously been the case, the focus of our inquiry regarding the impact of LB 555 is the effect of that bill upon the Sales Contract between MEC and NPPD, since the bill does not, on its face, bring about a taking of private property without due process or proper compensation. However, if the bill is applied to the situation involving those entities so as to require MEC to make payments for decommissioning costs apart from its contractual obligations to do so, then we believe that the bill is unconstitutional under the Fifth Amendment and art. I, § 21.
Contract rights are a form of property rights which may be taken for a public purpose only if just compensation is paid. United States TrustCompany of New York v. New Jersey, 431 U.S. 1, 19 n. 16 (1977). In the present case, as discussed above, MEC has vested rights under its contract with NPPD to pay for the decommissioning costs of the Cooper nuclear facility only in certain circumstances. If the provisions of LB 555 are applied in such a way as to require MEC to pay for the decommissioning costs of the Cooper Nuclear facility in any fashion apart from its obligations under the Sales Contract, then we believe that MEC's vested contract rights have been damaged or taken. That "taking" is for a public use, since NPPD is a governmental subdivision of the State of Nebraska, and MEC's private funds will be used to benefit public ratepayers who otherwise might pay more for decommissioning the facility. MEC would not be paid compensation for its contract rights under LB 555, nor would it be afforded due process. For those reasons, LB 555 cannot constitutionally be applied to the situation involving MEC and NPPD.
 SUMMARY
In our view, LB 555 does not constitute special legislation in contravention of art. III, § 18 of the Nebraska Constitution. However, to the extent that the provisions of LB 555 are applied so as to require MEC to pay for the decommissioning costs of the Cooper Nuclear facility in any fashion apart from its vested contract rights under the Sales Contract, then the bill would be unconstitutional as a violation of separation of powers, due process of law and art. 1, § 21 of the Nebraska Constitution. Finally, we also believe that it is highly likely that courts would consider LB 555 to be an improper impairment of the obligation of contracts should it be applied to the situation involving MEC and NPPD and MEC's obligations under the Sales Contract at issue.
 Sincerely yours, DON STENBERG
 Attorney General Dale A. Comer Assistant Attorney General
[1] The rights resulting from a contract vest upon the contract's execution and delivery. Pfeifer v. Ableidinger, 166 Neb. 464,89 N.W.2d (1958) (quoting Todd v. Board of Educational Lands Funds,154 Neb. 606, 48 N.W.2d 706 (1951)). The MEC/NPPD Sales Contract has obviously been executed and delivered.
[2] A motion for rehearing and rehearing in banc in Nebraska PublicPower District v. MidAmerican Energy Company, 234 F.3d 1032 (2000) was denied on January 24, 2001, and we are aware of no pending petition for a writ of certiorari in that case.
[3] Under the Contract Clause test established by the Nebraska Supreme Court, the final two factors of the Energy Reserves Group formulation are characterized as "whether that [contractual] impairment was nonetheless a permissible, legitimate exercise of the . . . sovereign powers." Millerv. City of Omaha, 253 Neb. 798, 806, 573 N.W.2d 121, 127 (1998).